**Opinion issued March 13, 2018**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-17-00197-CV**

———————————

**APEX KATY PHYSICIANS LLC, PANKAJ K. SHAH, MD, BHARATI SHAH, AND INDUS ASSOCIATES LLC, Appellants**

**V.**

**ABEER SAQER AND I CARE INTERNATIONAL LLC, Appellees**

---

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-25588**

---

## MEMORANDUM OPINION

This is an appeal from a summary judgment dismissing claims for fraudulent inducement and breach of a settlement agreement. The settlement agreement occurred in an earlier lawsuit, in which Pankaj K. Shah, M.D., his wife, Bharati Shah, their company, Indus Associates, LLC, and a company owned by Indus,

Apex Katy Physicians LLC ("Apex Landlord") (collectively, "the Shahs") sued Abeer Saqer and numerous other parties. The Shahs' claims arose from Apex Landlord's purchase and lease of real property for the operation of a hospital, which employed Saqer as its interim chief executive officer, never actually opened, and eventually filed for bankruptcy.

Before that case was tried, the Shahs entered into a settlement agreement with Saqer and her company, I Care International, LLC. At the time of the settlement, Saqer was also a potential witness in a separate lawsuit, in which a group of physicians who had invested in the failed hospital brought claims against Dr. Shah.

Several years later, the Shahs filed this lawsuit, alleging that Saqer fraudulently induced them into entering into the settlement agreement by falsely representing that she was insolvent and without knowledge of certain allegations made by the physician-investors in their lawsuit against Dr. Shah. The Shahs further alleged that Saqer then breached the settlement agreement's provision that she would not voluntarily testify against the Shahs by voluntarily testifying in a deposition in the physician-investors' lawsuit and at trial for the remaining defendants in the underlying lawsuit.

Saqer filed a hybrid motion for summary judgment, arguing in part that the Shahs had no evidence of damages. We hold that the Shahs failed to present more

than a scintilla of evidence of damages for either claim in their response to Saqer's motion. Therefore, we affirm.

## Background

### *The underlying dispute and litigation*

In 2007, the owners of Prestige Consulting, Inc. d/b/a Turnaround Management Group ("Prestige"), Adeel Zaidi and A.K. Chagla, believed that they could interest investors in purchasing real property in northwest Houston and operating a hospital there. Through Prestige, Zaidi and Chagla formed (1) Apex Landlord to purchase the property; (2) Apex Long Term Acute Care–Katy, L.P. ("Apex Tenant") to lease the property for use as a hospital; and (3) Apex Katy Physicians–TMG, LLC ("Apex TMG") to act as the general partner in Apex Tenant. Prestige was hired to staff and manage Apex Tenant, and one of Prestige's directors, Abeer Saqer, was hired to serve as Apex Tenant's interim chief executive officer.

Zaidi recruited a group of initial investors, including Dr. Shah, whose company, Indus, became the majority owner of Apex Landlord. Dr. Shah served as Apex Landlord's managing member.

Apex Landlord agreed to buy the real property from Medistar Corporation and to lease it to Apex Tenant. Shah, Zaidi, and the other initial investors then recruited a group of physician-investors to operate Apex Tenant as a long-term

3

acute-care hospital ("LTAC hospital"). In mid-2008, these physician-investors purchased partnership units in Apex Tenant and became limited partners with the initial investors, with Apex TMG acting as the general partner.

The enterprise was not a success. Apex Tenant never operated as an LTAC hospital, never paid a full month's rent, and eventually filed for bankruptcy. The failure resulted in two lawsuits.

In the first lawsuit, the Shahs sued Zaidi, Apex Tenant, Apex TMG, and Saqer (the "Zaidi Lawsuit").[1] The Shahs alleged that Apex Tenant had breached its lease agreement with Apex Landlord by failing to pay rent and that the other defendants had misappropriated Apex Tenant's funds and made various misrepresentations to the Shahs regarding Apex Tenant's management and finances.

In the second lawsuit, the physician-investors sued Shah, Zaidi, Chagla, Prestige, and several other initial investors (the "Ahmed Lawsuit"). The physician-investors alleged that Dr. Shah, on behalf of the initial investors, orally agreed to segregate their investments in a separate bank account dedicated solely to

---

[1]     The Zaidi Lawsuit was a consolidation of two lawsuits. In the first, Dr. Shah, on behalf of Apex Landlord, sued Zaidi, Apex Tenant, Apex TMG, Saqer, and several other parties. In the second, Zaidi and several other initial investors sued Dr. Shah, Mrs. Shah, and Indus. After the consolidation, Dr. Shah, Mrs. Shah, and Indus asserted various counterclaims and crossclaims.

development of Apex Tenant as an LTAC hospital and assured them that their investments would be returned if the project did not come to fruition.[2]

### *The settlement agreement*

In May 2011, while the Zaidi and Ahmed Lawsuits were both still pending, the Shahs entered into a settlement agreement with Saqer and her company, I Care International, LLC (collectively, "Saqer"). Under the settlement agreement, Saqer agreed to pay the Shahs $45,000 in three installments and to refrain from voluntarily testifying or providing evidence in any lawsuit brought against the Shahs, and the Shahs agreed to dismiss their claims against Saqer.

In the recitals to the settlement agreement, Saqer acknowledged that she had "no information" relating to the physician-investors' allegations against Dr. Shah, including specifically information relating to any of the alleged representations made by Dr. Shah. Saqer further acknowledged that she had provided the Shahs with a financial affidavit and that the Shahs had relied on the affidavit in agreeing to settle their claims against her.

Saqer's financial affidavit was attached as an exhibit to the settlement agreement. In the affidavit, Saqer summarized her then-current financial status. She stated that her average monthly expenses exceeded her average monthly

---

[2]     These representations did not appear in any of the written documents memorializing the investments.

5

income and that she had minimal assets. She further stated that she had already incurred $30,000 in attorneys' fees in defending herself in the Zaidi Lawsuit and that some of the fees remained unpaid. The Shahs maintained that they settled with Saqer for "less than a penny on the dollar" because it was "unlikely" they could collect on a judgment.

After the parties executed the settlement agreement, the Shahs discovered that Saqer had provided the physicians-investors with an affidavit to use in the Ahmed Lawsuit.[3] Saqer signed the affidavit about a month before she and the Shahs signed the settlement agreement and a week before the physician-investors filed the Ahmed Lawsuit. In it, she provided testimony that supported the physician-investors' allegations against Dr. Shah. She stated that, although Dr. Shah had "represented" that the monies collected from the physician-investors would be held in a separate bank account for the hospital's operating expenses, the monies were not actually held in such an account, and their "true use" was "concealed" from the physician-investors.

During the negotiation of the settlement agreement, Saqer did not inform the Shahs that she had provided the physician-investors with the affidavit, and the

---

[3]   The Shahs and Saqer dispute when the Shahs learned about the affidavit. In light of our disposition below, we need not determine when the Shahs learned of the affidavit's existence and assume that it was after the parties executed the settlement agreement.

settlement agreement does not refer to or acknowledge the affidavit's existence. Through counsel, Saqer informed the Shahs that the recitals in the settlement agreement were true and that some of the statements in the affidavit required clarification. Saqer answered a set of interrogatories to clarify the statements made in the affidavit.

After Saqer made her final payment under the settlement agreement, she filed an unopposed motion to dismiss the Shahs' claims with prejudice, which the trial court granted.

Over the next several years, there were several important developments in both the Zaidi and Ahmed Lawsuits. In the Ahmed Lawsuit, the parties continued discovery, and Saqer was deposed. Shah then moved for summary judgment, which the trial court granted, and we affirmed.[4] In the Zaidi Lawsuit, the parties went to trial, and Saqer testified as a witness for the defendants. The trial court entered a multi-million-dollar judgment in favor of Dr. Shah and Apex Landlord, which our sister court later reversed in part and remanded for a new trial.[5]

---

[4] *Ahmed v. Shah*, No. 01-13-00995-CV, 2015 WL 222171 (Tex. App.—Houston [1st Dist.] Jan. 15, 2015, no pet.) (mem. op.).

[5] *Zaidi v. Shah*, 502 S.W.3d 434 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

***The current lawsuit***

In May 2015, roughly four years after the parties entered into the settlement agreement, the Shahs filed this suit against Saqer. The Shahs asserted claims for fraud, fraudulent inducement, fraudulent nondisclosure, and negligent misrepresentation, alleging that Saqer had induced them into entering into the settlement agreement by failing to disclose that she had already prepared an affidavit for the physician-investors in the Ahmed Lawsuit and by falsely representing that she was insolvent and had "no information" relating to the physician-investors' allegations against Dr. Shah. The Shahs also asserted a claim for breach of contract, alleging that Saqer breached the settlement agreement by providing the affidavit to the physician-investors and by voluntarily testifying in the Ahmed and Zaidi Lawsuits.

Saqer filed a hybrid motion for summary judgment, which asserted numerous traditional and no-evidence grounds for dismissing the Shahs' claims. The Shahs then filed an amended petition, which dropped their claims for fraud, fraudulent nondisclosure, and negligent misrepresentation. The Shahs also filed a response to Saqer's motion, in which they clarified that they were no longer complaining about Saqer's failure to disclose the affidavit from the Ahmed Lawsuit.

The trial court granted Saqer's motion without specifying any ground. The Shahs appeal.

## No-Evidence Summary Judgment

**A.      Standard of review**

When, as here, a party moves for summary judgment on both traditional and no-evidence grounds, we first address the no-evidence grounds. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

In a no-evidence motion for summary judgment, the movant contends that there is no evidence of one or more essential elements of a claim or defense on which the nonmovant would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). The motion must state the specific elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).

To defeat a no-evidence motion for summary judgment, the nonmovant must produce more than a scintilla of evidence to raise a genuine issue of material fact on each challenged element. TEX. R. CIV. P. 166a(i); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). If the nonmovant fails to do so, the trial court grant the motion. TEX. R. CIV. P. 166a(i); *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015).

We review a no-evidence summary judgment de novo. *Bradshaw*, 457 S.W.3d at 79. We review the evidence presented by the no-evidence motion and

response "in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Gonzalez v. Ramirez*, 463 S.W.3d 499, 504 (Tex. 2015) (per curiam) (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.2d 572, 582 (Tex. 2006)).

## B.    Breach of contract

In her no-evidence motion, Saqer argued that she was entitled to summary judgment on the Shahs' breach-of-contract claim because there was no evidence that her alleged breaches of the settlement agreement caused the Shahs any damages. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (no-evidence motion challenging evidence of damages requires nonmovant to present damages evidence to avoid summary judgment); *B.Z.B., Inc. v. Clark*, No. 14-11-00056-CV, 2012 WL 353783, at *3 (Tex. App.—Houston [14th Dist.] Feb. 2, 2012, no pet.) (mem. op.) (affirming no-evidence summary judgment on breach-of-contract claim when nonmovant's evidence of damages was conclusory); *Nelson v. Regions Mortg., Inc.*, 170 S.W.3d 858, 862–63 (Tex. App.—Dallas 2005, no pet.) (no-evidence summary judgment on breach-of-contract claim is proper when nonmovant presents no evidence of damages).

In their response, the Shahs addressed Saqer's no-evidence challenge to the damages element of their breach-of-contract claim in one paragraph:

10

As a result of the [affidavit Saqer provided the physician-investors] and Saqer's voluntary deposition testimony, the Ahmed Lawsuit continued for more than two and one-half years. Eventually, the trial court entered summary judgment on Shah's motion, and the First Court of Appeals affirmed that judgment in January 2015. During that time, Shah incurred hundreds of thousands of dollars in attorney's fees defending against baseless claims propped up solely by Saqer's February Affidavit and voluntary deposition testimony.

However, none of the Shahs' allegations in this paragraph were supported by citation to evidence.[6] The Shahs did not support their allegations with an affidavit or deposition testimony from Dr. or Mrs. Shah, invoices received from their attorneys, or any other competent summary-judgment evidence that they incurred attorneys' fees as a result of Saqer breaching the settlement agreement.

It is well-established that allegations contained in pleadings and motions are not summary-judgment evidence. *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 540 (Tex. 2016); *Cardenas v. Bilfinger TEPSCO, Inc.*, 527 S.W.3d 391, 401 (Tex. App.—Houston [1st Dist.] 2017, no pet.). We hold that the Shahs failed to present more than a scintilla of evidence that Saqer's alleged breaches of the settlement agreement caused them any damages and that the trial court therefore properly granted summary judgment on the Shahs' breach-of-contract claim.

---

[6]     The Shahs did not allege or present evidence that they were damaged as a result of Saqer's trial testimony in the Zaidi Lawsuit.

11

## C.    Fraudulent inducement

In her no-evidence motion, Saqer argued that she was entitled to summary judgment on the Shahs' fraudulent-inducement claim because there was no evidence that her allegedly fraudulent misrepresentations injured the Shahs. *See Dow Chem. Co.*, 46 S.W.3d at 242 (no-evidence summary judgment on fraud claim is proper when nonmovant presents no evidence that fraud caused injury).

The Shahs did not directly respond to Saqer's contention that there was no evidence that they were injured by her allegedly fraudulent misrepresentations. They did, however, allege that, had they known Saqer's "actual financial condition," they would not have signed the settlement agreement.[7]

But like their allegations concerning the damages caused by Saqer's breach of the settlement agreement, the Shahs' allegation here was not supported by citation to any evidence. The Shahs did not produce an affidavit, deposition testimony, or any other competent summary-judgment evidence that they were injured by Saqer's representation that she was insolvent. And as we noted above, allegations contained in summary-judgment pleadings are not evidence. *Carswell*, 505 S.W.3d at 540; *Cardenas*, 527 S.W.3d at 401.

---

[7]    The Shahs' response did not address whether Dr. Shah would have signed the settlement agreement had he known that Saqer had information relating to the allegations made against him by the physician-investors in the Ahmed Lawsuit.

12

On appeal, the Shahs argue that, had they not executed the settlement agreement, Saqer would have been jointly and severally liable for at least a portion of the judgment in the Zaidi Lawsuit. But the Shahs make no attempt to explain why this is so. Just because the other defendants were found liable does not mean that Saqer would have been found liable too—a point underscored by our sister court's opinion, which partially reversed the trial court's judgment and remanded the case for a new trial. *Zaidi v. Shah*, 502 S.W.3d 434, 448 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Nor do the Shahs offer any evidence that Saqer had nonexempt assets that could satisfy a judgment against her.

Notwithstanding their failure to present evidence of any injury caused by Saqer's alleged fraud, the Shahs argue that summary judgment was improper because Saqer's summary-judgment motion only addressed the claims asserted in the Shahs' original petition and not their amended petition. We disagree.

In their original petition, the Shahs asserted four claims based on the same allegations—fraud, fraudulent inducement, fraudulent nondisclosure, and negligent misrepresentation. In their amended petition, they dropped three of those claims—fraud, fraudulent nondisclosure, and negligent misrepresentation—and kept only the fraudulent-inducement claim. They did not add any new claims.

Although the Shahs filed their amended petition after Saqer filed her summary-judgment motion, the fraudulent-inducement claim asserted in their

13

amended petition was essentially the same as the one asserted in their original petition. In both petitions, the Shahs alleged that Saqer fraudulently induced them into entering into the settlement agreement by falsely representing that she was insolvent and had "no information" relating to the physician-investors' allegations against Dr. Shah.

The Shahs themselves appear to recognize this. In their response to Saqer's motion, which they filed after their amended petition, the Shahs did not argue that summary judgment was improper because they had asserted new claims. Instead, they briefly summarized the claims asserted in their amended petition and then argued why Saqer's motion failed as to those claims.

The Shahs further argue that summary judgment was improper because Saqer did not move for no-evidence summary judgment on their fraudulent-inducement claim; rather, she moved for no-evidence summary judgment on their claim for common-law fraud. But fraudulent inducement is a "category of common-law fraud that shares the same elements" but adds "a promise of future performance made with no intention of performing at the time it was made." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *see Hooks v. Samson Lone Star, LP*, 457 S.W.3d 52, 57 (Tex. 2015) ("Fraudulent inducement is a subspecies of fraud; 'with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties.'" (quoting

14

*Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001)). The Shahs' dropped fraud claim and live fraudulent inducement claim were based on the same allegations, and Saqer moved for no-evidence summary judgment on the elements that the two claims share.

We hold that the Shahs failed to present more than a scintilla of evidence that Saqer's alleged fraudulent misrepresentation caused them any injury and that the trial court therefore properly granted summary judgment on the Shahs' fraudulent-inducement claim. *See Plotkin v. Joekel*, 304 S.W.3d 455, 480–81 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (holding that trial court did not err by granting buyer's no-evidence summary-judgment motion because sellers failed to present evidence of damages arising from buyer's alleged fraud).

## Conclusion

We affirm.

Harvey Brown
Justice

Panel consists of Justices Keyes, Brown, and Lloyd.

15